1

2

3

4

5

6

7

8                                UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ANDREY BERNIK,                                    No.  2:17-cv-2348 DAD AC

12                       Petitioner,

13          v.                                          FINDINGS AND RECOMMENDATIONS

14    SHAWN HATTON, Warden,

15                       Respondent.

16

17          Petitioner is a California state prisoner proceeding through counsel with an application for

18    a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the original

19    petition, ECF No. 1, which challenges petitioner's 2011 conviction for second degree murder.

20    Respondent has answered, ECF No. 11, and petitioner filed a traverse, ECF No. 22-1.

21                                          BACKGROUND

22    I.         Proceedings in the Trial Court

23          A.   The Evidence Presented at Trial

24          The jury heard evidence of the following facts.[1]  Stephan Bernik owned a landscaping

25    business.  He negotiated to sell the business to Valeriy Pishtoy and accepted a deposit from him.

26    The two could not reach agreement, however, and Pishtoy asked for his deposit back.  They both

27    ───────────────────

28    [1]  This statement of facts is adapted from the opinion of the California Court of Appeal, Lodged
      Doc. 9 at 2-4.  Petitioner has expressly adopted this summary.  ECF No. 1 at 10.

1  agreed to meet in a supermarket parking lot to discuss the issue.

2      At the appointed hour, each party arrived, accompanied by friends.  Stephan Bernik

3  arrived in a Mazda truck that was pulling a trailer.  Yury Dovgan was with him.  Alex Chekayda

4  and Roman Mysin arrived in a Lexus.  They came at Dovgan's request.  Petitioner, who is

5  Stephan Bernik's son and Dovgan's friend, arrived in a Nissan Titan pickup truck along with his

6  two brothers.

7      Dovgan had originally ridden with petitioner in the Titan, but prior to arriving at the

8  supermarket, the Mazda and the Titan stopped, and Dovgan got out.  He walked over to the

9  Mazda, walked back, and put a gun next to the seatbelt buckle in the Titan.  He then returned to

10  the Mazda and rode with the elder Bernik to the supermarket.

11      Accompanying Pishtoy were Hariton Prutyanu, his son Aleksandr Prutyanu, and

12  Yevgeniy Yakimov.  Hariton arrived in his own car, and Yakimov and Aleksandr came in

13  Aleksandr's car.  Pishtoy and Stephan Bernik started talking.  Pishtoy heard Bernik say to another

14  man, "Andrey, leave the gun."  Someone from behind Pishtoy put a rope around his throat and

15  started to hit him, while Stephan Bernik hit him from the front.  A violent fight broke out, and

16  Pishtoy was seriously injured.  One of his sons took him away.

17      After the fight, the parties began fleeing the parking lot.  Stephan Bernik drove out of the

18  parking lot in his Mazda truck and trailer.  As he did, Aleksandr's friend Yakimov jumped onto

19  the trailer.  The Nissan Titan rolled by Aleksandr, and as it did, someone from inside the truck

20  pointed a gun at him.  Then the Titan left the lot.

21      Petitioner's friend Dovgan jumped into the Lexus with Chekayda and Mysin, and they left

22  to follow Bernik's Mazda and the Titan.  Hariton and Aleksandr Prutyanu left in Hariton's car

23  and they, too, tried to follow the Mazda.

24      As the elder Bernik drove the Mazda, Yakimov moved from the trailer to the Mazda's

25  bed.  Bernik swerved the truck back and forth while Yakimov used a knife to break the rear

26  window.  With the truck still moving, Stephan Bernik opened the driver's side door, jumped out,

27  and ran away.  Yakimov also jumped out of the truck, threw his knife in some bushes, and ran

28  back to where his pickup was parked.

The driverless Mazda crashed into a fire hydrant.  Two witnesses stopped at the accident scene, and one pulled the keys out of the Mazda's ignition.  The Lexus pulled up to the scene, and Dovgan exited the Lexus.  Carrying a crowbar, he ran up to the Mazda, angry and yelling.  One of the witnesses calmed him down.  Meanwhile, the Titan pulled up across the street, and a gunshot from inside the Titan hit and killed Dovgan.  The Titan immediately left the scene.

Later, the victim's father, Vasily Dovgan, recorded a conversation he had with petitioner. In the conversation, petitioner admitted he killed his friend, Vasily's son.  The recording was played to the jury and a translated transcript was admitted into evidence by stipulation of the parties.  In the conversation, petitioner stated that at the time of the accident, he thought his father had been injured or killed while driving the Mazda and had fallen over out of sight.  He claimed that when he arrived at the scene, there were men with daggers running around, so he started shooting.  He did not aim at anyone but thought, "Whoever I hit, I hit."  However, he stated that as the Titan pulled away, he thought he had "finished" the person he shot.  He later learned he had killed "the wrong person."

Petitioner testified at trial.  He claimed that after the parking lot fight, he and his two brothers drove off in the Titan.  Before leaving the lot, he noticed some men on the other side of the fight were armed with weapons; one had a knife.  These men tried to block the Titan, so he brandished his gun to scare them.  He saw the man with the knife jump onto the Mazda's trailer and make his way to the truck's bed.  The man started hitting the truck's window with the knife. The Mazda and the Titan took different routes out of the parking lot, but both ended up on the same street, with the Mazda behind the Titan.  Petitioner saw the Mazda swerving back and forth behind him, and his brother, who was driving the Titan, made a U-turn to go help their father. The Mazda almost hit them, and then it crashed.  Petitioner could not see his father, so he thought his father had been stabbed and was slumped over in his seat.

The Titan made another U-turn and headed back to the crash site.  Petitioner saw someone by the Mazda who he thought was the man who had been in the back of the Mazda attempting to break its window, along with some people he thought were the man's friends.  He shot one time from the Titan to scare them away, and he saw someone fall.  He asserted he just shot toward the

3

Mazda and did not aim at anyone.  After firing the shot, the Titan immediately sped off.

Petitioner also did not call the police.  Petitioner believed the person he shot was the person who

had been in the back of the Mazda, whom he thought was Yakimov.  He later learned he shot

Dovgan.

B.   Outcome

A jury convicted petitioner of second degree murder.  Cal. Pen. Code, §§ 187, subd. (a),

189.  It also found that petitioner intentionally and personally used a firearm to commit the crime,

resulting in death.  Cal. Pen. Code § 12022.53, subds. (b), (c), and (d).  The trial court sentenced

defendant to a total prison term of 45 years to life: 20 years to life for the murder conviction, plus

a consecutive 25 years to life for the firearm enhancement.

II.      Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

conviction on May 2, 2016.  Lodged Doc. 9.  The California Supreme Court denied review on

August 10, 2016.  Lodged Doc. 16.

On December 2, 2016, petitioner filed a motion to recall the remittitur based on

ineffective assistance of appellate counsel.  Lodged Doc. 10.  The Court of Appeal summarily

denied the motion on December 22, 2016.  Lodged Doc. 12.  Petitioner filed a petition for

reconsideration on December 29, 2016, and the court denied that motion on January 5, 2017.

Lodged Docs. 13, 14.  Petitioner filed a petition for review in the California Supreme Court

regarding the denial of the motion to recall the remittitur, which was denied on February 15,

2017.  Lodged Docs. 17, 18.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a state court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as

4

1         determined by the Supreme Court of the United States; or

2         (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

3         State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.

1    Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

2    confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d

3    724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

4    summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a

5    state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

6    must determine what arguments or theories may have supported the state court's decision, and

7    subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

8                                         DISCUSSION

9    I.        Claim One: Ineffective Assistance of Counsel

10             A.  Petitioner's Allegations and Pertinent State Court Record

11             Petitioner alleges that his Sixth Amendment right to the effective assistance of counsel

12   was violated by trial counsel's failure to bring a motion, pursuant to Cal. Penal Code § 632, to

13   exclude the illegally recorded conversation between petitioner and Vasily Dovgan.  ECF No. 1 at

14   14, 18.  The substance of that conversation has been summarized above.

15             B.  The Clearly Established Federal Law

16             To establish a constitutional violation based on ineffective assistance of counsel, a

17   petitioner must show (1) that counsel's representation fell below an objective standard of

18   reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v.

19   Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

20   adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

21   errors, the result of the proceeding would have been different.  Id. at 693-94.  The court need not

22   address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

23   prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

24   sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

25             C.  The State Court's Ruling

26             This claim was raised on direct appeal.  Because the California Supreme Court denied

27   discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

28   decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

6

501 U.S. 797 (1991); <u>Ortiz v. Yates</u>, 704 F.3d 1026, 1034 (9th Cir. 2012).

The appellate court ruled in pertinent part as follows:

> To demonstrate ineffective assistance of counsel, a defendant must
> show both that counsel's performance was deficient and the deficient
> performance prejudiced the defense. (*Strickland v. Washington*
> (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693].) Because of
> the difficulties inherent in evaluating counsel's performance, "a court
> must indulge a strong presumption that counsel's conduct falls within
> the wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action 'might be considered sound
> trial strategy.' [Citation.]" (*Id.* at p. 689.)
>
> Counsel's performance here was not deficient. A motion to exclude
> the conversation as an unlawful eavesdropping under section 632
> would fail due to the exception contained in section 633.5. Section
> 632 prohibits a person from intentionally recording a confidential
> communication by an electronic recording device without the
> consent of all parties. (§ 632, subd. (a).) Generally, no evidence
> obtained from such eavesdropping is admissible at trial. (§ 632, subd.
> (d).)
>
> However, section 633.5 provides an exception to section 632's
> prohibitions. According to section 633.5, "[n]othing in Section . . .
> 632 . . . prohibits one party to a confidential communication from
> recording the communication for the purpose of obtaining evidence
> reasonably believed to relate to the commission by another party to
> the communication of . . . any felony involving violence against the
> person . . . . Nothing in Section . . . 632 . . . renders any evidence so
> obtained inadmissible in a prosecution for . . . any felony involving
> violence against the person . . . or any crime in connection therewith."
> (§ 633.5.)
>
> Section 633.5 exempts Vasily's recording of his conversation with
> defendant from section 632's prohibitions, and would defeat any
> objection to admitting the recording. Vasily recorded the
> conversation to obtain evidence regarding defendant's "felony
> involving violence against the person." His recording the
> conversation was not prohibited, and the transcript of the recording
> was admissible. Thus, any attempt by defendant's counsel to exclude
> the evidence would have been denied.
>
> Defendant claims section 633.5 does not apply here because, as he
> reads it, the statute applies only when the "felony involving violence
> against the person" is a felony committed against the person who is
> recording the conversation. No felony was committed against Vasily,
> so, defendant contends, evidence of the conversation was not
> admissible.
>
> Defendant's interpretation of section 633.5 is not consistent with the
> statute's language or the judicial precedent that interprets it. The
> statute applies to a "party to a confidential communication," but its
> scope reaches to evidence of any felony involving violence against

"the person." The Legislature used the term "the person" to extend the statute's scope beyond the communicating parties. A "person" is a "human being." (Black's Law Dict. (10th ed. 2014) p. 1324, col. 1.) Thus, for example, the phrases "crimes against the person" or "crimes against persons" refer to a "category of criminal offenses in which the perpetrator uses or threatens to use force" against a human being. (*Id.* at p. 454, col. 2.) The Legislature's use of the term "the person" in section 633.5 confers the same effect on the statute. It applies to evidence of "any felony involving violence against the person," or, in other words, violence against a human being.

Had the Legislature intended the statute to apply only to felonies committed against one of the parties to the communication, it would have limited its application to any felony involving violence against a "party to a confidential communication," the same term it used to designate the persons having the communication. Instead, the Legislature used the phrase "violence against the person." "It is a general rule of statutory construction that '[w]hen one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning.' [Citations.]" (*Klein v. United States* (2010) 50 Cal.4th 68, 80.) The term "person" in section 633.5 means something different than "party to a confidential communication."

Only two reported cases apply section 633.5 in fact situations similar to this case, and both apply the meaning of section 633.5 we apply here. *People v. Maury* (2003) 30 Cal.4th 342, concerned anonymous telephone calls made to, and recorded by, a public "hotline." The defendant in a murder trial sought to suppress evidence of his recorded calls to the hotline. As part of addressing that claim, the Supreme Court stated the taped communications were lawful under section 633.5 because they concerned three murders the police suspected defendant committed. (*Id.* at p. 385.) The recordings were lawful even though the violence was not committed against the person who recorded the calls.

*People v. Suite* (1980) 101 Cal.App.3d 680, involved recordings by state university police of telephone calls to their emergency telephone line in which the defendant stated bombs were in various campus buildings. The defendant claimed the recording of his calls violated section 632. The Court of Appeal disagreed, holding among other things that the calls were exempt from section 632 under section 633.5. It determined a bomb threat–in this case, threats involving buildings other than the one housing the police department–involved the potential for the type of violence against the person made admissible under section 633.5. (*Id.* at pp. 688-689.) Again, the recordings were lawful even though the threats were not made against the persons who recorded the calls.

The language of section 633.5 and the holdings of these cases indicate section 633.5 applies to recorded confidential communications containing evidence that connects a party to the communication to any felony involving violence against any person, not just to a felony involving violence against one of the parties to

the confidential communication. In this case, section 633.5 would
have defeated a motion by defense counsel to exclude evidence of
defendant's recorded conversation. Accordingly, we conclude
defense counsel did not render ineffective assistance by not moving
to exclude the evidence.

Lodged Doc. 9 at 5-8.

### D. Objective Reasonableness Under § 2254(d)

Petitioner contends that "[t]he state court's irrational expansion of section 633.5 to *all*
cases involving crimes against *any* person was plainly unreasonable." ECF No. 1 at 20:13-14
(emphasis in original). However, the state court's rulings on the interpretation and application of
Cal. Penal Code §§ 632 and 633.5 are not proper subjects of federal habeas review. See Estelle v.
McGuire, 502 U.S. 62, 67 (1991) (federal habeas relief unavailable for errors of state law). The
sole question before this court is whether the state court was reasonable in its resolution of the
Strickland issue, given the state of California law. This court is bound by the state court's
determination of what section 633.5 means and how it is properly applied. See Bradshaw v.
Richey, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's
interpretation of state law, including one announced on direct appeal of the challenged conviction,
binds a federal court sitting in habeas corpus."); Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)
("… state courts are the ultimate expositors of state law…and we are bound by their constructions
except in extreme circumstances not present here.").

Given the state court's resolution of the state law question, its disposition of the Sixth
Amendment question was the only possible outcome. Counsel cannot render deficient
performance by failing to make a motion that cannot have succeeded. Nor can failure to bring a
futile motion conceivably result in prejudice. Because there is nothing unreasonable about these
conclusions, § 2254(d) precludes relief on this claim.

II.    Claim Two: Excessive Pre-Charging Delay in Violation of Due Process

### A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his due process rights were violated by the unreasonable delay in
charging him. ECF No. 1 at 14, 22. The homicide occurred on April 12, 2006. The criminal
////

complaint was filed on February 19, 2009.  Petitioner was arrested on February 21 and arraigned on February 24, 2009.

On October 26, 2011, prior to trial, petitioner filed a motion to dismiss on grounds that the action's filing nearly three years after the homicide violated his due process rights.  1 CT 118.[2] Petitioner claimed he had been prejudiced by the late filing because a recording of a witness's 911 call had been destroyed in the interim, and the witness's statement to police differed from her statement to the 911 operator.  1 CT 123-126.  The prosecution claimed the delay was caused by its initial determination that Cal. Penal Code § 632 barred admission of the taped conversation between petitioner and Vasily.  When the prosecution later determined its interpretation of section 632 was mistaken, it immediately filed charges.  1 CT 135.  The trial court denied the motion to dismiss, finding that the prosecution's negligence did not prejudice defendant because there is no statute of limitations on murder, and he could still call the witness and the person who received the 911 call to testify.  1 RT 5-12.[3]

On appeal, petitioner did not pursue the theory that he had been prejudiced by destruction of the 911 call.  Lodged Doc. 7 at 13.  Instead, he argued in conclusory fashion that witness memories had faded with the passage of time.  Id.

    B.  The Clearly Established Federal Law

The Sixth Amendment speedy trial guarantee does not attach until a defendant is arrested or charged,[4] but the Due Process Clause protects against "oppressive" pre-accusation delay.  See United States v. Lovasco, 431 U.S. 783, 788-789 (1977); United States v. Marion, 404 U.S. 307, 324 (1971).  Due process may be violated where the investigative delay was undertaken to gain

---

[2]  "CT" refers to the Clerk's Transcript on Appeal, Lodged Docs. 1 and 2.

[3]  "RT" refers to the Reporter's Transcript on Appeal, Lodged Docs. 4 through 6.

[4]  The United States Constitution provides that criminal defendants have "the right to a speedy and public trial."  U.S. Const., amend. VI; see also Doggett v. United States, 505 U.S. 647, 651 (1992).  The determination whether a defendant's right to a speedy trial was violated is a fact-based inquiry that requires balancing various factors of the case including the: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant.  Barker v. Wingo, 407 U.S. 514, 530 (1972).  The length of delay serves as a "triggering mechanism," and if there is not a delay which is presumptively prejudicial, then there is no reason to consider the other balancing factors.  Id.  The Supreme Court has not applied this framework in the pre-accusation context.

1    tactical advantage over the defendant.  Lovasco, 431 U.S at 796.  The mere possibility of

2    prejudice from extended delay is insufficient to show a due process violation.  Marion, 40 U.S. at

3    325.

4              C.   The State Court's Ruling

5         The California Court of Appeal ruled as follows:

6              Defendant contends he was denied his due process right against
              precharging delay because the prosecution delayed arraigning him
7              for nearly three years after the homicide occurred. He claims he was
              prejudiced due to witnesses' memories fading and the prosecution's
8              negligence. We conclude defendant forfeits this claim. He does so by
              raising an argument on appeal that was not raised at trial, and by
9              failing to support his argument with any citations to the record. With
              no evidence before us, defendant fails to establish he was prejudiced.
10
              […]
11
              We conclude defendant has forfeited his due process claims. He
12            forfeits them on two grounds. First, he raises an argument here he did
              not raise at trial. He contended at trial that he was prejudiced due to
13            the destruction of a 911 recording. Before us, he omits that argument
              and claims he was prejudiced in part because witness memories had
14            faded. A criminal defendant " 'cannot argue the court erred in failing
              to conduct an analysis it was not asked to conduct.' " (People v. Tully
15            (2012) 54 Cal.4th 952, 980.)

16            Second, defendant forfeits his claim because he failed to provide any
              citations to the record to show the case "was replete with witnesses"
17            who could not remember the specifics of the event. Rule
              8.928(a)(1)(B) of the California Rules of Court requires a party to
18            support an argument with necessary citations to the record. Where a
              party does not comply with this rule, the party's argument is deemed
19            forfeited. (Nwosu v. Uba (2004) 122 Cal.App.4th 1229, 1246.)

20            Moreover, by providing no reference to the record, defendant fails to
              show he was prejudiced by the prosecution's delay. "A defendant
21            seeking relief for undue delay in filing charges must first demonstrate
              resulting prejudice, such as by showing the loss of a material witness
22            or other missing evidence, or fading memory caused by the lapse of
              time. [Citation.]" (People v. Abel (2012) 53 Cal.4th 891, 908.)
23            Because we do not assume prejudice (People v. Nelson (2008) 43
              Cal.4th 1242, 1250), and defendant fails to establish any, our analysis
24            of the due process claim ends here.

25    Lodged Doc. 9 at 8-10.

26            D.   Procedural Default

27         Respondent contends that this claim is procedurally defaulted, and the question of default

28    is contested.  See ECF No. 1 at 24; ECF No. 11 at 27-28; ECF No. 22-1 at 5-6.  Federal habeas

review is generally barred where claims have been rejected in state court on the basis of independent and adequate state law rules, including procedural barriers to their consideration on the merits.  Walker v. Martin, 562 U.S. 307, 315 (2011).  District courts may nonetheless determine a petition on its merits, bypassing an asserted procedural defense, where the underlying claims lack merit.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  The undersigned chooses to bypass the procedural issue presented here.

E.  Objective Reasonableness Under § 2254(d)

In addition to finding the pre-accusation delay claim forfeited on procedural grounds, the court of appeal held that petitioner had not made out a due process claim because he made no showing of prejudice.  This ruling cannot have been an objectively unreasonable application of Supreme Court precedent, because the Supreme Court has never held that a due process violation can be sustained in this context absent a showing of actual prejudice.  See Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam) (if no Supreme Court precedent provides the rule on which petitioner's claim depends, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law).

In contrast to the Sixth Amendment speedy trial context, see Barker v. Wingo, 407 U.S. 514, 530 (1972), in the pre-accusation delay context the Supreme Court has declined to recognize any presumption of prejudice based on the length of delay.  Quite to the contrary, the Court has explained that the existence of statutes of limitation adequately protects defendants from the potential prejudice inherent in delayed charging.  Lovasco, 431 U.S. at 789; Marion, 404 U.S. at 322.  That is precisely why a showing of actual prejudice is required.  In Marion, the Supreme Court reversed the dismissal of charges where the district court had found a three-year delay between offense and indictment offended the constitution.  Due process protects against fundamental unfairness at trial, and the Court held that the three-year delay in bringing charges, without more, did not demonstrate that the defendants could not receive a fair trial.  Marion, 404 U.S. at 323-24.  The Court declined to "determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution."  Id. at

12

324. <u>Marion</u> makes clear, however, that a showing of actual prejudice is required.

Petitioner's arguments that the prosecution failed to adequately justify the delay, and that the state courts failed to conduct a balancing of all factors going to the reasonableness of the delay, are unavailing in the federal habeas context—absent an objectively unreasonable application of Supreme Court authority by the California Court of Appeal, relief is barred.  No Supreme Court authority puts the burden on the prosecution to justify pre-charging delay, or requires balancing a la <u>Baker v. Wingo</u> in this context.  Particularly in light of <u>Marion</u>, a case also involving a three-year delay and no showing of actual prejudice, the state court's rejection of petitioner's due process claim cannot be considered objectively unreasonable.

III.    <u>Claim Three: Denial of New Trial Motion</u>

A.    <u>Petitioner's Allegations and Pertinent State Court Record</u>

Following the jury's verdict, petitioner moved for a new trial on grounds including newly discovered evidence. 1 CT 277-285.  Petitioner presented two items of evidence.  The first was the testimony of Dr. Boris Zhalkovsky, petitioner's psychiatrist.  Dr. Zhalkovsky had treated defendant from 2004 until April 2006, less than two weeks before the homicide, for anxiety and panic attacks.  In an opinion rendered in June 2012, following petitioner's November 2011 conviction, Dr. Zhalkovsky stated petitioner likely had a panic attack at the time of the shooting arising from his perceived inability to protect his father.  In Dr. Zhalkovsky's opinion, petitioner's behavior at the time of the crime and his immediately leaving the scene demonstrated the poor judgment that frequently accompanies patients with anxiety and panic attacks.  1 CT 294-297.

The second item of evidence consisted of a revised translation of the recorded telephone conversation between defendant and Vasily Dovgan.  In the version presented to the jury, petitioner told Vasily that when he saw his father's Mazda crash, he said, "That's it, dad's gone."  The new translation provided in the motion for a new trial was, "That's it, dad's dead."  1 CT 284-285.

The trial court denied the motion.  It held that Dr. Zhalkovsky's opinion did not qualify as newly discovered evidence as it could have been discovered earlier with reasonable diligence.  Petitioner knew he had panic attacks and had received treatment for them since 2004.  In addition,

13

he testified at trial and could have then explained any symptoms he may have experienced at the time of the shooting.  The revised transcript also did not qualify as newly discovered evidence, as petitioner was asked at trial, and gave, his own explanation of what he said in the recorded conversation.  He also had the original translation for two years prior to trial when he could have made a revision.  In addition, the court ruled that Dr. Zhalkovsky's opinion and the revised transcript would not have changed the outcome of the case.  3 RT 880-887.

## B. The Clearly Established Federal Law

No United States Supreme Court precedent holds that the discovery after conviction of evidence inconsistent with that conviction, without more, establishes a violation of federal constitutional rights or supports federal habeas relief.  Even affirmative proof of actual innocence does not provide a basis for federal habeas relief, because there is no "clearly established federal law" that recognizes a substantive constitutional right not to be criminally convicted if innocent. See Herrera v. Collins, 506 U.S. 390, 404 (1993); District Attorney's Office v. Osborne, 557 U.S. 52 (2009) (recognizing that the Supreme Court has not decided the issue).

In procedural contexts where "actual innocence" may be relevant to federal habeas proceedings, the standard is high: a petitioner must present reliable new evidence, in light of which no reasonable jury would have convicted him.  See Schlup v. Delo, 513 U.S. 298 (1995) (actual innocence as exception to procedural default); McQuiggin v. Perkins, 569 U.S. 383 (2013) (actual innocence as basis for equitable tolling of statute of limitations).  Meeting this standard does not entitle a petitioner to habeas relief; it only excuses a procedural defect that would otherwise bar federal consideration of some other, independently cognizable claim of a constitutional violation.

## C. The State Court's Ruling

The state appellate court ruled as follows:

> " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.]

14

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

The trial court here did not abuse its discretion in denying the motion for new trial sought on the basis of newly discovered evidence. Defendant could have discovered the evidence with any diligence prior to trial. Dr. Zhalkovsky's opinion did not qualify as newly discovered evidence, as defendant knew from two years prior to the murder that he suffered anxiety and panic attacks and was being treated for the condition by the doctor. If that was relevant to his defense, he could have informed his trial counsel or testified about it himself when he took the stand. He did neither. The revised transcript also did not qualify as newly discovered evidence, as defendant had the original transcript for two years prior to trial when he could have informed his counsel of a mistranslation. He also explained on the stand what he remembered he said in the conversation. In any event, the purported mistranslation was trifling. In the context of this case, defendant's statement of "[t]hat's it, dad's gone," is no different than, "[t]hat's it. Dad is dead."

Moreover, admitting the purported new evidence on retrial was not likely to result in a different result. Defendant admitted on the stand and in the conversation with Vasily that he killed the victim. He admitted the person he thought he shot was Yakimov. Although he now says he thought his father was dead or "gone," he claimed at trial that he was protecting his father. Yet, he immediately left the scene without checking on his father, he did not call the police, and he failed to explain these actions. This was sufficient evidence to support his second degree murder conviction with or without the new evidence.

Lodged Doc. 9 at 12-13.

        D.  Objective Unreasonableness Under § 2254(d)

        The appellate court denied this claim under the standards applicable to motions for new trials in California, without explicit consideration of any federal constitutional issue at stake.  The state law question is not subject to review here in any event, as it provides no basis for federal habeas relief.  See Estelle, 502 U.S. at 67.  Assuming a sub silentio rejection of the federal issue on the merits, there is nothing unreasonable about the state court's resolution of this claim.  To the contrary, because the United States Supreme Court has never held that the postconviction discovery of exculpatory evidence renders a conviction unconstitutional, AEDPA bars relief.  See

Wright, 552 U.S. 120, 125-26.  Accordingly, even if petitioner's evidence could be considered both "newly discovered" and exculpatory, federal habeas relief would be unavailable.

IV.     Claim Four: Jury Tampering and Related Jury Bias

A.  Petitioner's Allegations and Pertinent State Court Record

During deliberations, the jury informed the court that some "family members of the case" had had contact with some of the jurors.  The court then examined the affected jurors.[5]

Juror No. 11, the jury foreperson, stated someone in the audience had asked him how much jurors receive in fees for jury duty.  Juror No. 11 stated he had waived the fees.  After the jury had finished deliberations for the day, the same person contacted three of the jurors, including Juror No. 11, as they left the courthouse.  He asked if they were through for the day.  None of the jurors responded.  Minutes later, as the trio walked to their parked cars, Juror No. 11 noticed four people who had been in the courtroom, including the one who had questioned the group moments earlier, standing around a vehicle and watching the jurors get into their cars.  The four people did not say anything to the jurors.

As Juror No. 11 drove away, he noticed one of the four people, a female, was following him in her car.  They both continued onto the freeway.  Juror No. 11 was not certain she was following him, but he performed a couple of maneuvers in traffic and outmaneuvered the vehicle.  He did not feel afraid from these contacts, and none of the other jurors expressed fear when they heard about them.

Juror No. 10 had seen the same man Juror No. 11 described asking the jurors as they left the courthouse if they were done for the day.  The juror also saw him walk through the juror parking lot.  Juror No. 10 had seen a group of people outside the courthouse as the juror left for the parking lot but was not sure they were watching the juror.  The juror thought some of the female jurors were concerned and uncomfortable about these contacts, but they were not afraid.

Juror No. 6 reported seeing some of the people in the courtroom audience at a restaurant during lunch.  One of them was the same man described by Juror Nos. 11 and 10.  Juror No. 6

---

[5]  3 RT 798-862.

16

overheard a female in the group say "it's murder," and "left his father."  No one in the group addressed or contacted the juror.

Juror No. 5 was with Juror No. 11 when, leaving the courthouse, a man asked them if they were done for the day.  The juror replied they were. Juror No. 5 also saw the group of people from the courtroom audience watch as the jurors went to their parked cars.  The man who had inquired of them earlier was one of those who watched.

Juror No. 2 had also seen the group of people watching the jurors as they went to the jury parking lot.  Not wanting them to see her get into her car, Juror No. 2 held up and pretended to use her phone.  Juror No. 2 then saw a female and a male from the group walk through the juror parking lot.  The juror saw the male get into a car parked on the street that borders the lot.  Seeing this and hearing the other jurors talk about their experiences made Juror No. 2 wonder if she should be worried.

Juror No. 12 stated he had sat down in the hallway next to a female.  The juror did not recognize her.  The juror said good morning, the female said good morning, and she commented on the weather.  They exchanged a few words, and then the juror recognized the female as someone he had seen in the courtroom.  The juror got up and moved.

Juror Nos. 2, 5, 6, 10, 11, and 12 all stated these contacts would not affect their ability to be fair and impartial to both the prosecution and the defense, and they could set the contacts aside.  The court inquired of the entire panel, and all of the jurors indicated they could be fair and impartial for both sides.

> B.  The Clearly Established Federal Law

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Down, 366 U.S. 717, 722 (1961).  In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial. Remmer v. United States, 347 U.S. 227, 229 (1954).  The presumption is not conclusive, however.  What the constitution requires is a hearing at which a judicial officer "determine[s] the circumstances, the impact [of the contacts] upon the juror, and whether or not [they were]

prejudicial[.]"  <u>Id.</u> at 230 (ordering hearing on remand).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).

C.  <u>The State Court's Ruling</u>

The California Court of Appeal ruled as follows:

> "An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

> "A juror's . . . involuntary exposure to certain events or materials other than what is presented at trial generally raises a rebuttable presumption that the defendant was prejudiced and may establish juror bias. [Citation.] As relevant here, . . . [a] nonjuror's unauthorized communication with a juror during trial that concerns the matter pending before the jury likewise raises a presumption of prejudice. [Citations.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 95.) Other events outside the courtroom that may require examination for probable prejudice may "include attempts by nonjurors to tamper with the jury, as by bribery or intimidation." (*In re Hamilton, supra*, 20 Cal.4th at p. 295.)

> "[T]he presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant. [Citations.] Our inquiry in this regard is a 'mixed question of law and fact' subject to independent appellate review. [Citation.] But ' "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citations.]' [Citation.]" (*People v. Merriman, supra*, 60 Cal.4th at pp. 95-96.)

> After reviewing the record and the nature of the misconduct, we conclude there is no substantial likelihood the jury was actually biased against defendant due to the public contacts. Nothing in the record indicates the jurors understood which party the people who spoke with them and watched them were supporting. The incidents of direct comments to the jurors did not concern any substantive issue or evidence from the trial. Juror No. 6 overheard comments about the case, but there was no indication the comments were directed towards the juror or that the juror knew which party the people supported. Some of the jurors were concerned about being watched by people, but none of them expressed feeling fear or intimidation.

1

2  In addition, under the trial court's questioning, each juror stated he or she had not been affected by the contacts and could be fair and impartial to both sides. The court was entitled to rely upon those statements "to determine whether a juror can maintain his or her impartiality after an incident raising a suspicion of prejudice." (*People v. Harris* (2008) 43 Cal.4th 1269, 1304.) We defer to the trial court's credibility determinations when supported by substantial evidence, and the jurors' statements are substantial. (*Id.* at p. 1305.)

3

4

5

6  Under the totality of the circumstances, there is no substantial likelihood the jurors were actually biased against defendant due to the public contacts. The trial court did not err in denying the motion for new trial on this basis.

7

8  Lodged Doc. 9 at 15-16.

9  D.  Objective Unreasonableness Under § 2254(d)

10  In applying Remmer, supra, the Ninth Circuit has consistently distinguished actual

11  tampering, defined as "an effort to influence the jury's verdict by threatening or offering

12  inducements to one or more of the jurors" and giving rise to a strong presumption of prejudice,

13  from run of the mill ex parte contacts which carry no such presumption.  United States v. Dutkel,

14  192 F.3d 893, 895 (9th Cir. 1999); see also, Moody v. Chappell, 554 Fed. Appx. 588 (9th Cir.

15  2014) (finding habeas relief unavailable under § 2254(d) where jurors were contacted but not

16  threatened or bribed by trial spectators).  Taking circuit precedent as a guide to the reasonable

17  application of the Supreme Court's jury tampering jurisprudence, see Renico v. Lett, 559 U.S.

18  766, 779 (2010) (under AEDPA, circuit authority does not define but may illuminate the contours

19  of "clearly established federal law"), the state court's ruling was eminently reasonable.

20  Nothing in the trial court record demonstrated that any spectator had threatened or offered

21  inducements to any juror.  Accordingly, petitioner cannot prevail on a theory of presumed bias.

22  The trial court held a thorough hearing that explored the impact of the contacts on each of the

23  affected jurors, which is what is constitutionally required in cases of either tampering or garden

24  variety ex parte contacts.  See Remmer, 347 U.S. at 230 (tampering); Smith, 455 U.S. at 217 (ex

25  parte contacts).  The court was entitled to accept the jurors' sworn testimony that they could

26  remain impartial.  Murphy v. Florida, 421 U.S. 794, 800 (1975).  Because there is nothing

27  objectively unreasonable, either factually or legally, in the state court's conclusion that

28  petitioner's jury remained impartial despite the ex parte contacts, relief is unavailable.

19

V.      Claim Five: Failure to Properly Instruct the Jury on Transferred Intent

      A.   Petitioner's Allegations and Pertinent State Court Record

The jury was instructed as follows pursuant to CALCRIM No. 562:

> If the defendant intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed.

CT [].

Relying on People v. Matthews, 91 Cal. App. 3d 1018, 1024 (1979), petitioner requested that the jury be instructed further that "any defense that applied to an intended killing, applied to the unintended killing as well." 3 RT 747. The trial court denied the request. Id.

      B.   The Clearly Established Federal Law

Claims of error in state jury instructions are generally matters of state law, and thus may not be considered on federal habeas review. See Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993). Federal habeas relief is available only where instructional error violated due process by rendering the trial fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Alleged instructional error "must be considered in the context of the instructions as a whole and the trial record." Id. at 72. In challenging the failure to give an instruction, a habeas petitioner faces an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

      C.   The State Court's Ruling

The state appellate court ruled as follows:

> Under the common law doctrine of transferred intent, "one's criminal intent follows the corresponding criminal act to its unintended consequences. . . . [T]he reasoning applies equally to carry the lack of criminal intent to the unintended consequences and thus preclude criminal responsibility." (People v. Matthews (1979) 91 Cal.App.3d 1018, 1023 (Matthews), italics omitted.) Accordingly, "the doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander." (Id. at p. 1024.)

> Defendant argued he was not guilty of any crime due to lawful self-defense, and, alternatively, he was not guilty of murder because he did not intend to kill. He requested a pinpoint instruction on transferred intent. Relying on Matthews, he sought to add the following language to CALCRIM No. 562: "any defenses that

20

applied to any intended killing applied to the unintended killing as well." The trial court denied the request, holding that CALCRIM No. 562 adequately explained the law. The court instructed the jury with CALCRIM No. 562 as follows: "If the defendant intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

Defendant contends the trial court erred by refusing to give his pinpoint instruction modifying CALCRIM No. 562. He asserts the instruction would have been beneficial in jury deliberations, as defendant testified he just wanted to scare people away from his father.

The trial court did not err. A court may refuse a proposed instruction when another instruction covers the same point. (*People v. Clark* (2011) 52 Cal.4th 856, 975.) Other instructions the court gave to the jury here fully explained the point defendant wanted addressed. The court instructed the jury with a pinpoint instruction also offered by defendant, instruction No. 505a, that specifically addressed defendant's theory. The instruction read: "If the defendant acted in justifiable defense of another, but he mistakenly injured or killed a bystander, he did not commit any crime against that person. In other words, the defendant is not guilty if he justifiably attempted to defend another person, but by mistake he injured or killed a bystander. The prosecution has the burden of proving beyond a reasonable doubt that the defendant did not act in justifiable defense of another person."

Moreover, the court gave instruction No. 505a in the context of other instructions that addressed defendant's defenses to the shooting. The court instructed as follows: "If a person kills with a legally valid excuse or justification, the killing is lawful and he has not committed a crime;" and "[t]he defendant is not guilty of murder or manslaughter if he was justified in killing someone in defense of another." The court went on fully to instruct on the defense of self-defense.

The court also gave instructions that addressed the defense of lack of intent to kill. The court instructed on killing in the heat of passion and imperfect self-defense, both of which theories would have reduced defendant's crime to voluntary manslaughter due to a lack of intent. In addition, the court stated: "In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter."

The court also instructed on involuntary manslaughter, where a person kills without the intent to kill and without conscious disregard for human life. It stated: "Involuntary manslaughter is a lesser offense to murder . . . . When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter." The court fully explained the elements of involuntary manslaughter.

21

> Taken together, the court's instructions addressed defendant's theory based on transferred intent–that he acted in self-defense and did not intend to kill. Because the theory was so fully covered, the court did not err when it refused to give defendant's duplicative pinpoint instruction.

Lodged Doc. 9 at 17-19.

### D. Objective Unreasonableness Under § 2254(d)

The state court's rejection of this claim involved no objectively unreasonable application of clearly established due process principles. The reviewing court was required to consider the instructions as a whole and in the context of the entire trial, Waddington v. Sarausad, 555 U.S. 179, 191 (2009), and it did so. The court correctly identified several other jury instructions that covered petitioner's transferred intent theory. It is readily apparent that the jury was permitted to fully consider petitioner's assertion of self-defense in the transferred intent context – petitioner testified in support of this theory, and defense counsel argued it to the jury. The jury instructions did not in any way limit consideration of the defense theory. Accordingly, there was no fundamental unfairness. Even if the requested pinpoint instruction was proper as a matter of state law, the failure to give it does not support federal habeas relief. See Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

### VI.   Claim Six: Insufficient Evidence to Support Verdict

#### A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that the evidence was insufficient to disprove self-defense.

#### B.  The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt. United States v. Winship, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1974). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326. "A reviewing court may set aside the jury's verdict on the ground

22

of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Cavazos</u> <u>v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam).  In other words, a verdict must stand unless it was "so unsupportable as to fall below the threshold of bare rationality."  <u>Coleman v. Johnson</u>, 566 U.S. 650, 656 (2012).

        C.   <u>The State Court's Ruling</u>

      The California Court of Appeal ruled as follows:

> Defendant contends insufficient evidence supports his conviction of second degree murder because he acted only to protect his father from what he thought was an attack by a man with a knife. We disagree, as ample evidence supports the conviction.

> To convict defendant of murder, the jury had to conclude defendant (1) committed an act that caused the victim's death, (2) acted with malice, and (3) killed without lawful excuse or justification. (§§ 187, 189.) Malice is either express or implied. Defendant acted with express malice if he manifested "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) He acted with implied malice if the killing resulted from " 'an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by [defendant] who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.)

> Substantial evidence supports the first two elements of murder. Defendant's act of shooting caused the victim's death, and defendant acted with either express or implied malice. Defendant's later admission that he had killed "the wrong person" implies he intended to kill someone. Moreover, he intentionally and deliberately fired his gun into the crowd of people gathered by the Mazda, knowing his act would endanger their lives but consciously disregarding that fact. Defendant's explanation of his thought process at the time of the shooting perfectly describes implied malice: "Whoever I hit, I hit."

> Sufficient evidence also supports the third element of murder; the jury's determination that defendant killed without justification. For a killing in defense of another to be justified, the defendant must actually and reasonably fear that the person is in imminent danger of great bodily injury or death. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

> Substantial evidence at trial indicated defendant did not actually believe his father was in imminent danger. Defendant shot only one shot from the truck, and then he and his brother immediately left the scene without checking on their father or seeing if the shot had scared people away. Defendant testified he believed all of the people surrounding the Mazda were hostile to his father, yet after firing the shot, he left the scene while purportedly thinking his father was still surrounded by people defendant believed were hostile. Defendant also did not seek police assistance or medical aid for his father. He

1
2

> returned to the scene some hours later after he learned he had shot
> his friend. Police were there, but he did not speak with them. He
> called his attorney.

3
4
5

> This evidence was sufficient for the jury to conclude defendant did
> not actually fear that his father was in imminent danger of harm.
> Because there was no actual fear, the killing was not justified, and all
> of the elements of second degree murder were met.

6    Lodged Doc. 9 at 19-20.

7         D.  Objective Unreasonableness Under § 2254(d)

8         Although the state court did not cite Jackson v. Virginia or explicitly apply the federal

9    constitutional standard it prescribes, this court may not grant relief unless the state court's

10   analysis was objectively unreasonable under Jackson.  See Early v. Packer, 537 U.S. 3 (2002)

11   (even if state court fails to cite or indicate awareness of federal law, its decision must be upheld

12   "so long as neither the reasoning nor the result of the state-court decision contradicts" clearly

13   established United States Supreme Court authority).  Nothing in the state court's resolution of this

14   issue is inconsistent with Supreme Court precedent.

15        Under Jackson, the appellate court was obliged to view the evidence in the light most

16   favorable to the judgment and to consider all reasonable inferences in support of that judgment.  It

17   did so.  There is nothing objectively unreasonable in the conclusion that the verdict was not

18   irrational.  The jury heard petitioner's testimony in support of his self-defense theory, and

19   rejected it.  Neither the state appellate court nor this court may revisit that credibility

20   determination under binding Supreme Court precedent.  Particularly in light of the "double dose

21   of deference" to the verdict that is required under Jackson and the AEDPA, Boyer v. Belleque,

22   659 F.3d 957, 964 (9th Cir. 2011), federal habeas relief is unavailable.

23       VII.   Claim Seven: Ineffective Assistance of Appellate Counsel

24        A.  Petitioner's Allegations and Pertinent State Court Record

25        Petitioner alleges that appellate counsel violated minimum constitutional standards by

26   failing to raise the issue that petitioner was denied his right to a fair trial when the court forced

27   him to testify with a sheriff's deputy sitting directly behind him.  ECF No. 1 at 39.

28   ////

At trial, a uniformed sheriff's deputy sat behind petitioner when he was at counsel's table and also accompanied him to the witness stand and sat nearby while petitioner testified.  Before petitioner took the stand, defense counsel asked that the escort officer remain at counsel's table. 2 RT 482.  Counsel argued that petitioner had not shown himself to be dangerous at trial or during his three years of incarceration, and that he had no prior criminal record.  2 RT 483.  The trial court rejected this request, giving the following explanation:

> Now, insofar as whether or not the escort officer is going to be allowed to accompany the defendant to the stand, now I'll note that our escort officers actually are seated a lot closer to the defendants during the course of the trial while the defendant is seated at counsel table than they ever would be at – once or if the defendant takes the stand.

> But in this particular case, and I do understand that you know the Court can exercise its discretion as long as the Court makes case specific reasons for ordering the escort officer to accompany and sit by while the defendant testifies.

> And I am going to exercise that discretion. In this particular case in the first instance we have probably the most egregious type of crime that one man could commit against another which is murder.

> So this is a very serious crime. But the Court doesn't base its justification solely on the nature of the crime. But I also want to indicate that during the course of this trial it's pretty apparent to this Court that the defendant has a very difficult time controlling himself.

> Simply put, I don't think anyone looking at this record and looking at this defendant and looking at the defendant's actions during the course of this trial, could say that he has conducted himself in an exemplary fashion; in fact, it's quite the contrary.

> I'm concerned because the defendant can't control himself. In fact, on several occasions the defendant has had a number of outbursts where we've essentially lost at least two days, two complete days to this trial because he could not control himself.

> I imagine that during the course of his testimony, once again we'll go through a situation where, once again, he can't control himself and he can't control his emotions. It's not as though he's just sitting there silently crying to himself and I think we've described it for the record he's – you know, he rocks back and forth, he loses his emotions, he starts – you know, snot starts to come out of his nose, on one occasion he started mumbling to himself.

> And I'll note that when the defendant starts doing that each time – and I've had several escort officers granted. The last couple of days I've had the same escort officer, each time the escort officers have attempted to assist the defendant in trying to control his emotions.

25

They've provided him – one occasion I saw a deputy provide him with water. On another occasion they provided him with some Kleenex. Next he now has a box of Kleenex in front of him.

Be that as it may, he was still unable to control himself on at least two of those occasions the defendant started ripping at his tie, ripping at his shirt and the deputies once again they really didn't put their hands on him, they didn't attempt to subdue him in any fashion, they attempted to simply help him. But they were unable to do so.

So I have a very real concern based on what the defendant has demonstrated throughout the course of this trial that he's unable to control himself. And, God forbid, the defendant will be unable to control himself start ripping off his clothes and run through this court.

I haven't seen that yet, but based on his actions he simply is not able to control himself.

I think the Court would be remiss in this case if the Court were not to station a deputy – let me indicate this. The deputy will be stationed a bit further away than the deputy is stationed near the defendant as the defendant sits at that counsel table.

I intend to have a deputy simply sit closer because it is close space here the deputy is going to sit closer to the jury box than he would the defendant.

I am not intending to have a deputy stand behind the defendant. I don't think that's necessary that he stand behind him.

But I am going to have him sit off to the side approximately – it would be no more than five feet from where the defendant is seated as he testifies.

And, you know, as I indicated, I don't know – I really don't know what the policy of the other courts in this county even are. I don't know from court to court. I imagine that judges go through the same type of hearing that we're conducting right now, but I'm not basing – I want to make it clear I'm not basing my ruling on any perceived policy around this courthouse.

And I do understand that the Court needs to balance the need for some type of heightened security risk against the additional precaution inherent and prejudicial, at least to the extent that the jurors might be – the defendant might be prejudiced in the eyes of the jury.

And I am balancing that need. But in this particular case given the actions of the defendant throughout this trial it's clear to me that it would not only assist the orderly processes of this court, but it would also benefit the defendant who is unable – simply put, has been unable to control himself throughout this trial.

I don't think anyone – like I said, I don't think anyone looking at the case could look at the defendant and say that he is able to control himself.

So I have a very real concern not only for the safety of this court, but also for the orderly administration of this court and I've described that repeatedly throughout the record.

There were several other occasions when we – counsel approached the bench when we were considering recessing because the defendant was unable to control himself.

And I'll note yesterday was one of those days. And I know you went and talked to him and then the defendant for the first time yesterday, although he sat there crying, he wasn't as demonstrative as he had been on those earlier occasions.

So I want to make it clear that the Court has very fact specific reasons for stationing a guard or a bailiff near the witness stand and I am – I am going to deny your request to have the escort officer wait at the table while the defendant testifies.

2 RT 484-489.

The jury was subsequently instructed as follows:

The fact that a member of the Sacramento County Sheriff's Department was sitting near the defendant while he testified is not evidence. Do not speculate about the reason. You must completely disregard that circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations.

3 RT 760.

      B.   <u>The Clearly Established Federal Law</u>

A criminal defendant enjoys the right to effective assistance of counsel on appeal. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391 (1985). Claims that this right has been violated are evaluated under the framework of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). Under <u>Strickland</u>, the constitution is violated when (1) counsel's representation falls below an objective standard of reasonableness, and (2) the defendant is prejudiced by the unreasonable performance. <u>Strickland</u>, 466 U.S. at 692, 694. To demonstrate prejudice in the appellate context, petitioner must show a reasonable probability that he would have prevailed on appeal absent counsel's alleged errors. <u>Smith</u>, 528 U.S. at 285-286.

      C.   <u>The State Court's Ruling</u>

The claim of appellate ineffective assistance was presented to the California Court of

27

1 | Appeal in a motion to call the remittitur, which was denied without comment.  Lodged Doc. 12.

2 | A petition for review was summarily denied by the California Supreme Court.  Lodged Doc. 18.

3 |              D.  Objective Unreasonableness Under § 2254(d)

4 |       Because the state courts rejected this claim on the merits but without a written opinion,

5 | this court must determine what arguments or theories may have supported the state court's

6 | decision and subject those arguments or theories to § 2254(d) scrutiny.  Harrington v. Richter,

7 | 562 U.S. at 102.  The question remains objective reasonableness under clearly established

8 | Supreme Court precedent.  Id.

9 |       Petitioner's appellate ineffectiveness claim could reasonably have been rejected on either

10 | the performance prong of Strickland or for lack of prejudice, for the same reason: the claim had

11 | little likelihood of success.  Under California law, a "deputy's presence at the witness stand

12 | during a defendant's testimony is not inherently prejudicial."  People v. Stevens, 47 Cal.4th 625,

13 | 638 (2009).  In deciding where to station security personnel in the courtroom, a court "must

14 | exercise its own discretion to determine whether a given security measure is appropriate on a

15 | case-by case basis."  People v. Hernandez, 51 Cal.4th 733, 742 (2011).  Such determinations are

16 | reviewed for abuse of discretion.  Id. at 741.  Given the trial court's extensive, case-specific

17 | factual findings regarding petitioner's inability to control himself in the courtroom, there can be

18 | no reasonable likelihood that petitioner would have prevailed on appeal had counsel presented the

19 | issue.  Appellate counsel cannot be faulted for deciding to weed out a weak claim.  See Jones v.

20 | Barnes, 463 U.S. 745, 751-54 (1983).  And because there is little likelihood of a different result,

21 | the ineffective assistance claim fails for lack of prejudice.  See Smith, 528 U.S. at 285-286.

22 | CONCLUSION

23 |       For all the reasons explained above, the state courts' denial of petitioner's claims was not

24 | objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

25 | HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

26 |       These findings and recommendations are submitted to the United States District Judge

27 | assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

28 | after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

he shall also address whether a certificate of appealability should issue and, if so, why and as to

which issues.  <u>See</u> 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

within fourteen days after service of the objections.  The parties are advised that failure to file

objections within the specified time may waive the right to appeal the District Court's order.

<u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 14, 2023

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE